United States v. Stein. The appellant, Mr. Stein, is represented by Ms. Turner, who will speak first. Good morning, Your Honors. This is Kendall Turner, and I'm appearing on behalf of Mitchell Stein. I'll be touching on three points, which I'll list briefly now and then discuss in a little more detail. First, Mr. Stein's conviction and sentence must be vacated because the government knowingly used false evidence to secure a conviction and substantial sentencing enhancements. Second, the district court erred in inflating the amount of loss caused by the alleged fraud by incorporating victims and amounts not causally connected to the fraud. And third, the district court's forfeiture order was flawed because Honeycutt precludes joint and several liability and because the forfeiture order includes amounts not traceable to the offense. I'll take each of these points in turn, but especially since I can't see you, just please feel free to let me know what you'd like to focus on. Speaking only for myself, your first issue, which I think is pretty well barred by the law of the case, is not where I'd be spending the most amount of my time if I were in your position. But that's only for me. You're entitled to spend your time the way you see fit. Well, let me just briefly say something about the due process claim, and then I'll move on. So the last time the case was here, this court rejected that claim for two reasons. It held that the burden of proof is on the defendant and the testimony might not have been false. The new evidence introduced on remand demonstrates without contradiction that that testimony was false. So the only way to sustain the conviction now is this court's burden of proof holding. That new evidence was available, fully available to the defendant originally, was it not? No, your honor, because the government actually had listed Mr. Tribue as a witness and then elected not to call him. And Mr. Stein wanted to call him, but the district court did not want to delay proceedings. I didn't ask you if Mr. Stein tried to present the evidence he knew about the first time through. My question was, it was known to Mr. Stein the first time through, was it not? Yes, your honor, but again, Mr. Stein... Then there can be no Giglio or Brady issue, or at least no Giglio issue without the second component. I mean, it may be that the district court erred in prohibiting him from presenting that, but that's not something that we revisited under the law of the case because there's no new evidence about whether the district court erred in preventing him from presenting that the first time through. But having said that, you're free to respond in any way you wish and spend as much time on this as you want to. I just, I don't think it's your strongest issue. I think you've got some stronger issues, but again, that's one-third of the court speaking, so proceed as you wish. Understood, your honor. Just briefly, so the evidence is new in that it makes clear for the first time that there is a connection between Tribune and the purchase order. The last time this court was, the case was here, this court said that the evidence presented by the government wasn't necessarily false because there wasn't an obvious connection between the purchase order and the check from Tribune. This new evidence, which was not materially available to sign the last time the case was here because the government had not produced it in response to sign specific requests for it, satisfies this court's prior test, the suppression requirement that your honor is referring to. But again, our position is that that test is flawed because as the chief judge recognized in Alzate, the harmless error standard, not the Brady standard, should apply to the false evidence claims. But turning to the district court's finding of loss amount, the same problems this court saw before persist. The government can prove the loss amount with direct evidence or with indirect evidence of loss. And there is not any direct evidence here because none of the allegedly injured investors testified and said that they relied on the fraudulent information. And many who submitted statements expressly disclaimed reliance on the alleged fraud. And while the government tried to prove the loss amount with circumstantial evidence, that evidence is insufficient. As Judge Pryor explained last time this case was before the court, loss can be proven circumstantially if the market in which the security trades is first shown to be efficient. But otherwise, there's no reason to think that the information about security is affecting the stock price because the market is not informationally efficient. In other words, it's not... Counsel, I'm sorry, this is Robert Luck. While certainly Judge Pryor in a concurring opinion, not joined by any other judge, laid out one theory in which this can be proven, she was also quite clear that's not the only theory and mentioned that there may be other mechanisms by circumstantial evidence direct for testimony that this could be done. And here, as I understand it, the government presented expert testimony of an event analysis. And that event analysis, for lack of a better word, seems to be somewhat of a differential diagnosis, which is let me go through all the things that it could be and explain why they're not and show that why for that reason it has to be this. Why is that not a valid methodology in which to show that there was a cause-effect relationship between the alleged illegal conduct and the drop in the price or the inflation of the price? Sure. So the only thing the event study showed was that in connection with one of the purchase orders, there was a statistically significant change in the stock price. And there's no reason to think that that change correlates to the information. It just shows that there is a meaningful change, but it's different from typical variation in the volatility in the stock returns. But the expert testified that there was a causal relationship, and she testified that there was a causal relationship because, A, there was an asymmetry of information which only showed that this was the only information the company was putting out and anyone knew about the company. And, B, she went through all the different other things it could be, that your client pointed out at the last appeal, including the things that your client pointed out at the resentencing, and showed that it couldn't have been those things. Whether it's correct or not, how is that not a legitimate basis for which the trial court can make the findings that it did? So, first, the last time this case was here, this court already held that the sort of general testimony that the only place to get information about signalized stock was from press releases and public filings is not sufficient to support a finding of reliance. And in terms of the efforts to segregate out the short-selling and the financial crisis, the district court actually did not make any findings about whether Dr. Becker's study in that event or in that regard should be credited. That's in DE 561. What about at the sentencing hearing? Didn't the district court ultimately at the hearing, even though in its order it did not mention anything, ultimately at the hearing come back and say, you know what, it happened? For example, at docket entry 578, pages 4 to 5 specifically, quote, just for the record, to the extent that I was relying upon Dr. Becker's event study for the primary basis of the guideline, the loss to investors, I want to clarify that I believe Dr. Becker's event study properly accounted for reliance by investors and also properly accounted for intervening events that may have been contributed to the investor losses. Why is that not a sufficient finding? It's not a sufficient finding because the court doesn't explain why it reached that conclusion. And even if that were adequate in other contexts, here because the Eleventh Circuit specifically said the district court was obligated to make findings regarding the effects of these intervening events and the district court did not do that. But even if you disagree with me, at most Dr. Becker's event study shows a statistically significant change in the stock price in connection with one of the purchase orders. So only loss connected to that one purchase order, not the others, should be incorporated into the finding of loss amounts. Why would that matter if it's only one or all of them? There were separate counts related to a larger conspiracy. Why would it matter if it's only related to one or more than one? Because the loss calculation includes the entire period of the loss. So the first press release, there are three press releases at issue, and the loss calculations date from the first press release. That's from September 20th. Are we talking about a difference of days between the next press release, the one we're talking about where the purchase order was announced, the $3.3 million one? We are talking about a difference of days, but even the last time this case was here, the number of investors that the government was trying to advance was in the thousands, and on remand it was 616, and that is in part because the loss period was limited. As I understand it, the guideline commentary tells us, and I'm not quoting, I'm paraphrasing, but that the loss amount is not, we don't need to calculate it to metaphysical certainty. In other words, reasonable estimations based on evidence are sufficient, correct? That is correct, Your Honor, but the government does, as this Court said last time this case was here, it bears the burden of proving, among other things, proximate causation. And I take Your Honor's point that it can, in some cases, be very difficult to prove that. But on the other hand, the defendant is entitled to have the government make its case, and it's not fair to allow a more lax standard of proof simply because it's difficult in a certain factual setting. And I want to just briefly touch on the forfeiture issue before my time is up. Before you do, counsel, this is Judge Marcus. I want to just go back and ask one question. Do our prior cases require a finding of market efficiency when a circumstantial method of proof is used to establish reliance? So there are cases in the civil context where that has been required. Not in the sentencing context, but again, the government's burden of proof is obviously higher in a criminal context. So if anything, it should be heightened, not relaxed. Well, the reason I ask the question is when I looked at it, your own expert had conducted an event study in the past without establishing any market efficiency. And at least as I looked at the prior order in this court, we never required a showing of market efficiency to establish the point circumstantially. Time has expired. Go ahead and answer Judge Marcus' question and any other questions that he or Judge Luck have. Thank you. So first, as to why Mr. Stein's expert did not establish market efficiency in other cases, that is because they were large-cap stocks. They were more analysts analyzing them. There are more people trading them. There is greater informational efficiency. Signalife is a penny stock. In a penny stock market, several courts have found, and I believe there's congressional testimony to this effect that we said in our brief as well, generally do not trade in an efficient market. And in terms of whether this court has previously required a proof of market efficiency, it is an open question for a penny stock like this whether that must be proven. But we recommend that this court adopt Judge Pryor's view and the view endorsed by various civil cases. And I'll discuss forfeiture on remand. Or, sorry, on rebuttal. Thank you, counsel. Representing the affilee is Mr. Handel. Good morning, Your Honors. I may have pleased the court. Josh Handel from the United States. Just a roadmap for the court a bit. I'm, of course, happy to answer any questions that any of Your Honors have at any time. But I'm planning to focus first on the loss calculation, which is the only issue that the government believes is preserved and presented for decision here. And then once we get through that, I'll touch briefly on the due process claim and the forfeiture objection. When this court ordered resentful in Mr. Stein's case three years ago, you instructed the district court to do two things on remand. First, to require specific circumstantial evidence before presuming that Mr. Stein's representations had induced shareholders to invest in Signalife. And second, to eliminate the price effect of intervening events or market forces extraneous to Mr. Stein's conduct. The district court faithfully executed that mandate, and there's no reason to send this case back for a third round of sentencing. Turning first to investor reliance, this court held in 2017 that victim impact statements from a handful of investors were not sufficient to support the inference that every Signalife investor had relied on Mr. Stein's purchase order fraud. On remand, the government adduced three forms of new and specific evidence of investor reliance. First, an event study produced by Dr. Becker, which showed a statistically significant correlation between Signalife's share price and the announcement of the fraudulent purchase orders. Specifically, there was a statistically significant abnormal return of 18% on September 25, 2007, the day that Signalife had disclosed its $3.3 million purchase order. Second, Dr. Becker's in-court expert testimony that Signalife was the type of company and the type of stock for which sales information would have been the principal data point for investors. And third, a showing substantiated by news aggregators, chatroom logs, and in-court testimony, and acknowledged by Mr. Stein's counsel that the only information about Signalife was available to the market with the company's own representations about its performance. On the basis of that evidence, Dr. Becker concluded that the statistically significant inflation in Signalife's share price was attributable to the purchase order fraud, and the district court accepted her findings as reliable and credible. Turning next to causation. This court held in 2017 that the district court had failed to exclude the possible impact of intervening events on Signalife's share price, and it specifically highlighted two factors that the court should examine on remand. Number one, short selling of Signalife stock, and number two, the across-the-board market decline that happened in 2008. So in resentencing, the government had its expert analyze those factors in order to isolate the price impact of Mr. Stein's purchase order fraud. With respect to short selling, Dr. Becker found no evidence that it contributed to the decline in Signalife stock. She based that conclusion on two data points. First, that during time periods where Signalife stock price was rising, there was typically more short selling than there was during time periods where Signalife stock price was falling, which is the opposite of what she would have expected if short selling were indeed driving the decline. And second, that Signalife's short selling volume as a percentage of its total trading volume in 2008 was actually less than the average short selling volume for a sample of 350 stocks listed on the New York Stock Exchange. With respect to broader stock market trends, Dr. Becker conducted two regression analyses comparing Signalife's performance against, first, a market index of all exchange listed stocks in the United States, and second, an industry index of stocks from the medical equipment sector. She found a moderately negative correlation coefficient between Signalife and the market index, indicating that Signalife and the market typically moved opposite one another, and a smaller negative coefficient between Signalife and the industry index, suggesting no statistically significant relationship there. So Dr. Becker concluded... Council, sorry, this is Robert Luck. Can you address your opposing council's point that the only statistical, and I think you even referenced this in your presentation, the only statistically significant event was the second press release, the one with the $3.3 million purchase from, I think it's ITC. If that's the case, and there was no evidence of a statistically significant or causal relationship with the earlier press release, the one from September 20th, isn't there at least some difference in days and some difference in investors that would be captured by this? And if so, is that significant enough to change the loss amount and the victim number amount that it would make a difference in the guideline calculation? So I don't think so, Your Honor. So a couple of points about that. Dr. Becker went through, and she looked at each of these dates, and she identified abnormal returns on each of these dates where there were purchase orders. It's true that the $3.3 million purchase order was the only one that exceeded whatever parameters she had set down for statistical significance, and so she took the amount of inflation that was attributable to that purchase order, the 18% abnormal return attributable to that purchase order, and treated that as the amount of inflation in signalized share price starting on September 25th and going forward until the fraud was revealed. And that's at Documentary 551, page 49. So I don't think there's any change in the fraudulent period. I don't think there's any change in the number of affected investors or in the loss amount. I would also point out that the district court went to great lengths to make sure that the loss estimate was as conservative as possible. As my friend on the other side has pointed out, a number of victims who either testified or submitted victim impact statements ended up being left out of that list of 616 victims that the district court ultimately settled on, and that's because the district court made the government go back a couple of times, reduced calculations in order to keep narrowing that population of victims. And so I think that... Council, wasn't the numbers, though, that the district court asked you to come back to starting from the original purchase order date or the original press release date? In other words, didn't the district court instruct you, hey, government, give me the numbers starting from this date to this date as opposed to these other dates? I believe that's right, Your Honor, but I don't think, and again, I'm happy to look back at the record and submit a letter or something if this turns out to be false, but my understanding is that the amount of inflation that the district court was looking at from this event study was the 18% amount starting on September 25th. It may be the case that there was, you know, a small handful of investors who fell into that September 20th to September 25th period who had a smaller abnormal return that was docked against them. Again, I would have to go back and double-check the record on that because the actual material determinations that were driving the loss amount and the number of investor victims here was calculating from the September 25th point when there was the 18% abnormal return and then figuring out between the two partial disclosure events when that 18% return had been brought back down to zero. Just to be clear, you don't agree, or do you or do you not agree that the $1,029,570 amount and $616 investor amount includes people from starting September 20th or does not include people starting September 20th? I don't know the answer to that, Your Honor. I would have to go back and look at the record. Let me help you out a little bit. So on Document Entry 557, the district court, after the hearing, asked for supplemental calculations, quote, that remove any losses that investors allegedly incurred on the sale of signalized stock which was purchased after September 20th, 2007, but which was sold before August 15th, 2008, end quote. And then in response, which is the next docket entry, 558, the government filed a notice stating that the total loss is that number which I just stated and the 616 investors which I stated. And then the district court entered an order consistent with those numbers. Sure. So, I mean, that seems to resolve the issue. I think that if that is, in fact, the case, you still have the fact that the investors who bought their stock in those five days between September 20th and September 25th would only have been charged the abnormal return that Dr. Becker had concluded was attributable to the September 20th purchase order and not to the September 25th purchase order. But, again, I mean, we are talking about a very, very narrow subsection of this, and I understand that the court wants to get it right and wants to understand exactly what the numbers are and all that kind of stuff, but this is not going to meaningfully affect... It certainly will not affect the sentence. I just... And I think that's the key part, counsel. My concern is that... And I don't have it in front of me, the guideline cut-off for loss amount. Your number's at $1,029,000. So if the cut-off for the next two levels down is less than a million, then only $29,000, which isn't all that much money when we're talking about a number of investors, might affect that amount, and that's my concern. Sure, I totally understand that. I would point out, to the extent we're worried about that, you know, again, this... The district court engaged in a lot of narrowing of this class, and the district court was trying to be as conservative as possible. We also have the fact that Mr. Stein adduced his own expert testimony, and his expert arrived at a loss attributable to signalized quarterly filing of about $1.6 million. So that evidence was also before the district court at the time. Now, of course, Dr. O'Neill, Mr. Stein's expert, only thought that about a third of that loss should be attributed to the revelation of the fraudulent purchase orders and the rest to other pieces of information, to the large quarterly loss that Signalite had reported and to its negative stockholders' equity. But as the district court pointed out during questioning, both of those other figures directly result from the fact that Signalite had failed to realize the $5 million in sales revenue that Mr. Stein had promised. So, again, we have two experts here. They're both putting forward testimony that more than $1 million is attributable to the revelations in Signalite's quarterly filing in August of 2008. I think it's very reasonable to look at what Mr. Stein's expert said and say, you know, $525,000 of that is directly attributable and the other million or million and change is a reasonably foreseeable consequence of that fraud. I do... In the event that the court has any questions about the due process claim or forfeiture, I want to be sure to save a little bit of time for questions on that, but I'm happy to answer anything else on loss amount before we move on. Just one question. This is Judge Marcus. Again, have we ever held at a time of sentencing in a case like this that there was a requirement to establish market efficiency? No, Your Honor. Certainly not in the sentencing context. And I know that the concurrence to the previous decision... The concurrence to the previous decision did lay out the parameters of the basic presumption as one possible evidentiary path that the government could take on remand, but even the concurrence did not suggest that that would be required. I don't believe this court has ever required the government to meet the parameters of the basic presumption at sentencing, and I don't think it would be consistent with the commentary to Guidelines Section 2B1.1, which says that the district court need only make a reasonable estimate of the loss based on available info. Here, the available information was Dr. Becker's event study, Dr. O'Neill's event study, Dr. Becker's testimony that you don't need to test for market efficiency in order to do a methodologically sound event study, and Dr. O'Neill's admission that he had also conducted similar event studies without first testing for market efficiency. I certainly don't think, on the basis of this record, you can say that it's clear error for the district court to have adopted Dr. Becker's findings. Thank you. Just very quickly, because I know my friend said that she was planning to address forfeiture and rebuttal. With respect to forfeiture, Mr. Stein has challenged both traceability I'm sorry, was someone trying to cut in there? No. Mr. Stein has challenged both traceability and co-conspirator liability. There's no serious question that Mr. Stein waived his traceability objection by not raising it during his first appeal. He doesn't point to any intervening decision of this court or the Supreme Court that changed the traceability calculus, so that aspect of his forfeiture challenge is clearly foreclosed at this juncture. And for similar reasons of procedural default, this court shouldn't consider his belated challenge to be a position of co-conspirator liability for the funds retained by Mr. Carter. Again, Mr. Stein had an opportunity to object to the forfeiture order on this ground in his initial appeal, and he failed to do so. Treating a forfeiture challenge based on honeycut as waived when it is not raised at the first opportunity on direct appeal is consistent with decisions of the Fifth Circuit and the Fourth Circuit, and very recently, this court's holding in United States v. Bain, which we discussed in the 28-J letter that we sent last week. I know that Mr. Stein has attempted to distinguish Bain because it arose on collateral review, but this court explicitly reserved its decision on the question whether a collateral mechanism can be used to challenge a forfeiture order, and it decided the case instead on the much more pedestrian ground that a failure to challenge joint and sub-reliability on direct appeal put me in position of forfeiture for closing the later challenge unless the defendant can establish cause and precedent. Time has expired. Thank you very much, Your Honors. Unless there are further questions, I respectfully request that you affirm. Thank you, counsel. Ms. Turner, four minutes. Thank you, Your Honors. I want to touch on two points. First, just responding to the points that my opposing counsel made about the loss amount. First, Dr. Becker's study does not show causation or reliance. It just shows an abnormally large change in the stock price, and even Dr. Becker acknowledged, and this is in DE 551 at page 116, that other causes could have caused large changes in the stock price and that she did not analyze them. And you cannot assume that large changes in the stock price are because of information unless you have shown that the market is informationally efficient. And then turning to forfeiture, so my friend mentioned that this challenge is foreclosed because Mr. Stein did not raise this on the first go-round, but the district court, in resentencing Mr. Stein, had to enter a new forfeiture order. And just in the same way as if a death sentence was vacated on appeal and then the defendant was again sentenced to death, the defendant could challenge that death sentence, including by raising challenges that were not raised the first time. So I assume, counsel, I assume under your position then, if there are evidentiary rulings in the first trial, properly preserved but not raised on appeal, and then we remand because of an entirely unrelated matter, let's say failure to suppress some evidence before trial. And it goes back for a new trial and there's a judgment. You say you can raise those evidentiary rulings because you objected to them the first time? I'm sorry, could you say that one more time? There's always a new judgment. Every time you vacate a conviction or reverse a conviction or vacate or reverse a sentence, there's always a new judgment embodying both the conviction and the sentence. That's the way our judgment rules work. So you're saying anything you raised the first time, I'm sorry, anything that you preserved the first time but didn't raise on appeal, even though we have a limited remand, because they reinstate the judgment, you can raise anything you want even though you didn't raise it the first time through. Is that correct? Anything that the district court necessarily had to reconsider in issuing its judgment, and that's exactly... It doesn't reconsider every ruling it made the first time through. It reconsiders what the court of appeals tells it to reconsider. And our remands are, you must do this, occasionally, for this reason. You must do this. And the district court does it. And then it reinstates the judgment having complied with our limited remand or our limited instructions. And under your position, that reopens everything. Why would any system issue concerned about finality want to say because of the happenstance that there was a reversal on another ground, it reopens everything to the second appeal? Well, that's exactly what happened in the Supreme Court's decision in Magwood. The petitioner there was challenging an amended judgment, and he challenged something the second time that he could have challenged the first time but did not do so. And the Supreme Court held that that was permissible because there was a new judgment. But even if you do not agree with me about this, it is clear that Mr. Stein can challenge the district court's forfeiture order on Honeycutt grounds. And the Supreme Court's decision in Honeycutt shows that joint and self-repliability is impermissible under both of the forfeiture statutes here, 981 and 982. And this court's decision in Carlisle confirms that that opinion applies to Section 981 and the similar language in Section 982. For all these reasons... I just have one question for you, if I may. I just want to read to you the mandate from the prior panel. It was, quote, we vacate his sentence and remand to the district court with instructions to calculate anew the amount of loss for purposes of U.S. Sentencing Guideline 2B1.1B1 and restitution under the MVRA. That was the beginning and the end of the remand by the district court. Basically, you're asking us to go far beyond that, and I'm not sure I know, holding Honeycutt aside, how we can do that. Sure. So the rule that the district court is limited to the scope of the remand has exceptions, including exceptions for where a manifest injustice would be worked if the district court limits itself to the scope of the remand. And that, again, is what we submit that that exception applies here. This scope of the remand rule is just a jurisprudential rule. It is not a limit on the district court's authority or Mr. Stein's ability to challenge issues and play at sentencing. Thank you. Thank you, counsel. We'll take that case under submission.